# United States Court of Appeals
## For the First Circuit

No. 21-1149

WE THE PEOPLE PAC; BILLY BOB FAULKINGHAM, State Representative;
LIBERTY INITIATIVE FUND; NICHOLAS KOWALSKI,

Plaintiffs, Appellees,

v.

SHENNA BELLOWS,* in her official capacity as the Secretary of
State of Maine, JULIE FLYNN, in her official capacity as the
Deputy Secretary of State of Maine for the Bureau of
Corporations, Elections and Commissions,

Defendants, Appellants.

―――――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

―――――――――

Before

Barron, Chief Judge,
Kayatta, Circuit Judge,
and Saris,** District Judge.

―――――――――

Jason Anton, Assistant Attorney General, with whom Aaron
M. Frey, Attorney General, Thomas A. Knowlton, Deputy Attorney
General, and Jonathan Bolton, Assistant Attorney General, were on

―――――――――

* Pursuant to Federal Rule of Appellate
Procedure 43(c)(2), Shenna Bellows was substituted for Matthew
Dunlap on February 23, 2021.

** Of the United States District Court for the District
of Massachusetts, sitting by designation.

brief, for appellants.

        <u>Paul A. Rossi</u>, with whom <u>IMPG Advocates</u> was on brief, for appellees.

_____

July 7, 2022

_____

**BARRON**, <u>**Chief Judge**</u>.  Maine allows for direct popular participation in the state's lawmaking process through two distinct means:  a "people's veto," as it is commonly known, and a "direct initiative."  Me. Const. art. IV, pt. 3, §§ 17-18.  To place either type of measure on the state ballot, a "written petition" that contains a minimum number of signatures from those who are "qualified to vote for Governor" in Maine must be filed with the Secretary of State of Maine.  <u>Id.</u> § 20.

Maine law refers to a person who "solicits signatures for the petition by presenting the petition to the voter, asking the voter to sign the petition and personally witnessing the voter affixing the voter's signature to the petition" as a "circulator." Me. Stat. tit. 21-A, § 903-A.  Maine law further provides that the "circulator" must be a Maine resident who is also registered to vote in Maine.  <u>Id.</u>

This appeal arises from a suit that challenges both the residency and the voter-registration requirements.  The suit alleges that each requirement, by restricting who may be a circulator, violates the First Amendment to the United States Constitution as incorporated against the states by the Due Process Clause of the Fourteenth Amendment.  <u>See</u> <u>Grosjean</u> v. <u>Am. Press</u> <u>Co.</u>, 297 U.S. 233, 245 (1936).

- 3 -

The suit was brought in 2020 in the United States District Court for the District of Maine by a nonprofit organization, a political action committee, a Maine State Representative, and a professional collector of signatures for petitions who resides in Michigan. The plaintiffs named as the defendants the Secretary of State of Maine in his official capacity and the Deputy Secretary of State of Maine for the Bureau of Corporations in hers.

On the same day that the plaintiffs filed their suit, they also moved for a temporary restraining order and/or a preliminary injunction to prevent the residency requirement and the voter-registration requirement from being enforced. The District Court denied the request for the temporary restraining order but ultimately granted the motion for the preliminary injunction. The defendants now appeal from that latter ruling. We affirm.

**I.**

**A.**

The portions of the Maine Constitution that pertain to the "people's veto" provide that "[t]he effect of any Act, bill, resolve or resolution or part or parts thereof" that the Maine Legislature passes "shall be suspended upon the filing" of a "written petition," and that the measure thereafter must be "voted

on by the people." Me. Const. art. IV, pt. 3, § 17 (emphasis
added); see also Me. Senate v. Sec'y of State, 183 A.3d 749, 753
(Me. 2018) (describing the "people's veto"). The portions of the
Maine Constitution that pertain to "direct initiative[s]" state
that "[t]he electors may propose to the Legislature for its
consideration any bill, resolve or resolution," though "not an
amendment of the State Constitution, by written petition." Me.
Const. art. IV, pt. 3, § 18(1) (emphasis added). These provisions
also state that, unless the proposed direct initiative is "enacted
without change by the Legislature," it must be "submitted to the
electors together with any amended form, substitute, or
recommendation of the Legislature," who then may "choose between
the competing measures or reject both." Id. § 18(2).

Under the Maine Constitution, the "written petition"
referred to in the provisions quoted above must contain a specified
number of valid signatures of eligible Maine voters and be filed
with the Maine Secretary of State ("the Secretary"). The total
number of signatures "shall not be less than 10% of the total vote
for Governor cast in the last gubernatorial election." Id.
§§ 17(1), 18(2).

The Maine Constitution defines a "circulator" as "a
person who solicits signatures for written petitions." Id. § 20.
It states that a circulator "must be a resident of [Maine] and

whose name must appear on the voting list of the city, town or plantation of the circulator's residence as qualified to vote for Governor." Id. A Maine statute provides that the "written petition" referenced in these provisions of the Maine Constitution "may be circulated by any Maine resident who is a registered voter acting as a circulator of" such a petition. Me. Stat. tit. 21-A, § 903-A.

At the time that the written petition is filed with the Secretary, the circulator "must sign the petition." Id. § 902. The circulator also must "verify by oath or affirmation" that she "personally witnessed all of the signatures" collected "and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be." Id.

The circulator must file alongside the written petition an executed affidavit that includes "[t]he circulator's printed name, the physical address at which the circulator resides and the date the circulator signed the affidavit." Id. § 903-A(4)(A). The affidavit must include attestations that "the circulator was a resident of [Maine] and a registered voter in [Maine] at the time of circulating the petition." Id. § 903-A(4)(C). If the circulator "[k]nowingly fails to truthfully execute and timely file" an affidavit, that individual "commits a Class E crime." Id. § 904(6).

- 6 -

The Secretary must "determine the validity of the petition . . . within 30 days from the date" that the petition is filed with her. Id. § 905(1). In undertaking that review, the Secretary may invalidate signatures that are obtained from individuals who are not residents of Maine or that are collected by circulators who were not in compliance with the residency and voter-registration requirements. See, e.g., Hart v. Sec'y of State, 715 A.2d 165, 166 (Me. 1998); Jones v. Sec'y of State, 238 A.3d 982, 985 (Me. 2020).

Additional provisions of the Maine Constitution concern the duration of the petition circulation process. See Me. Const. art. IV, pt. 3, §§ 17(1), 18(1). They require that the requisite number of signatures for a written petition must be secured within a specified period after the circulation process begins for a direct initiative petition, and after the legislative session at which the challenged action occurred for a people's veto petition. Id.

### B.

Except where noted otherwise, the following facts are not in dispute in this appeal. In 2019, the We the People PAC ("We the People"), a political action committee registered in the State of Maine, and state Representative Billy Bob Faulkingham, who represents the 136th district in the Maine State House of

Representatives and is a member of We the People, sought to sponsor, and also circulated a petition in support of, a direct initiative entitled, "An Act to Clarify the Eligibility of Voters." The proposed direct initiative sought to "force the state legislature to adopt verbatim [a] proposed ban on all non-citizen voting in the State of Maine or place the question on the next general election ballot . . . to be decided by the voters of Maine."[1]

For the initiative to be placed on the ballot, the Secretary first must "furnish[]" or "approve[]" a "form[]" that is then circulated for signatures by qualified voters.  Me. Const. art. IV, pt. 3, § 20.  This form, once approved, is the "written petition."  See id.

Maine law provides, however, that "the written petition" for a direct initiative "may not be filed in the office of the Secretary of State later than 18 months after the date the petition form was furnished or approved by the Secretary of State."  Id. § 18(1).  Maine law further provides that only those signatures collected within the year leading up to the date on which the

---

[1] Maine law already limits the franchise in state and local elections to United States citizens who are or will be at least eighteen years of age at the time of the upcoming general election.  Me. Const. art. II, § 1; Me. Stat. tit. 21-A, §§ 111(1), 111-A.  The proposed initiative would have "amend[ed]" the voter qualification statute to emphasize" these requirements to be a voter "in an election in a municipality."

petition is filed with the Secretary count as valid. See Id.
§ 18(2) ("A signature is not valid if it is dated more than one
year prior to the date that the petition was filed in the office
of the Secretary of State."). Moreover, Maine law provides that
the signed petition must be filed with municipal authorities or
state election officials "for determination of whether the"
signatures are of "qualified voters" by the tenth day before the
signed petition is filed with the Secretary. Id. § 20.

In light of these provisions, the proponents, to have
placed their proposed direct initiative on the November 2020 ballot
would have to have filed their signed petition with the Secretary
by February 3, 2020 (and for municipal or election official
certification ten days before that); to have placed their proposed
direct initiative on the November 2021 ballot, the proponents would
have to have filed their signed petition with the Secretary by
January 21, 2021 (and for municipal or election official
certification ten days before that); and to have placed their
proposed direct initiative on the November 2022 ballot, the
proponents would have to have filed their signed petition with the
Secretary by February 26, 2021 (and for municipal or election
official certification ten days before that). See id. §§ 18, 20.
To file a petition after February 26, 2021, its supporters would
have had to apply to the Secretary for a new petition form, which,

once approved, would have restarted their eighteen-month approval clock. See id. § 20. They then could have collected signatures on that form and would have had to have filed a signed petition by January 31, 2022 for placement of a proposed direct initiative on that same November 2022 ballot.

Having obtained their approved petition form on August 26, 2019, the supporters of the initiative could begin gathering signatures. They claimed in an interrogatory response that they used only circulators who were Maine residents. The petition for the initiative would have needed a minimum of 63,067 signatures to have been placed on the November 2020, 2021, or 2022 ballots, given the number of votes cast in the prior gubernatorial election, which was held in 2018. See id. § 18(2).

By October 16, 2019, only 2,000 people had signed the petition after it had been approved for circulation nearly two months before. The campaign to collect signatures then lay dormant for the following year.

The plaintiffs resumed the petition drive in mid-October 2020, this time with the aid of not only Maine residents but also out-of-state residents who assisted in the process of securing signatures for the petition. The out-of-state residents worked with in-state "witnesses" but did not themselves purport to

serve as circulators.  Between mid-October 2020 and late January 2021, 38,000 signatures for the petition were collected.

### C.

The plaintiffs are We the People, Representative Faulkingham, and the Liberty Initiative Fund, a nonprofit organization that has been involved in petition circulation efforts, including the petition circulated for the direct initiative at issue here, as well as Nicholas Kowalski, a professional collector of signatures for petitions who resides in Michigan.  The plaintiffs filed suit in the United States District Court for the District of Maine on December 31, 2020.  They named as defendants then-Secretary of State Matthew Dunlap and Deputy Secretary of State for the Bureau of Corporations, Elections and Commissioners Julie Flynn, in their official capacities.[2]

The plaintiffs brought claims under state and federal law, including under the First Amendment to the federal Constitution, that challenged both the residency and voter-registration requirements to be a circulator.[3]  The same day that

_____

[2] On February 23, 2021, Dunlap was substituted by Shenna Bellows, the current Secretary of State of Maine.

[3] The plaintiffs' complaint also challenged other provisions of Maine law that impose certain disclosure

the plaintiffs filed their suit, they also moved for a temporary restraining order and/or a preliminary injunction.  The plaintiffs in so moving requested that the District Court enjoin  the defendants from enforcing Maine Revised Statutes title 21-A, § 903-A, "to the extent it requires that petitions for a direct initiative or people's veto may only be circulated by a registered voter of Maine" and "may only be circulated by a resident of the State of Maine, as applied to out-of-state circulators who first submit to the jurisdiction of the State of Maine for any investigation and/or prosecution of alleged violations of Maine's election code with respect to" direct initiative or people's veto petitions.

    The District Court denied the plaintiffs' application for a temporary restraining order on January 11, 2021.  The District Court concluded that "[e]ven though the plaintiffs raised serious legal issues, because the caselaw in this area is nuanced, because the plaintiffs failed to provide a sufficient uncontested factual record, and because the plaintiffs delayed bringing this lawsuit, they failed to sustain their burden to demonstrate that

---

requirements on circulators and proponents of direct initiative and people's veto petitions.  Those requirements are not before us because the plaintiffs did not request that they be preliminarily enjoined in their motion for a temporary restraining order and/or preliminary injunction.

they [were] likely to succeed on the merits of th[e] claim." We the People PAC v. Bellows, 512 F. Supp. 3d 74, 77 (D. Me. 2021).

Then, on February 16, 2021 -- the day by which the plaintiffs were required to submit their petition to local officials to have their proposed direct initiative placed on the November 2022 general election ballot -- the District Court ruled on the motion for the preliminary injunction. See We the People PAC v. Bellows, 519 F. Supp. 3d 13, 44 (D. Me. 2021). The District Court noted that, in light of the defendants' argument that the declarations that the plaintiffs had submitted in support of their motion for a preliminary injunction lacked foundation, it would "disregard[] any portions [of the declarations] that lack foundation or consist of improper opinion." Id. at 17 n.2. But, the District Court denied the defendants' additional objection to the plaintiffs' responses to the defendants' interrogatories that had been requested as part of the briefing on the motion for a preliminary injunction. Id.

The defendants' objection rested on the contention that the plaintiffs' responses to the interrogatories were "extremely problematic" because they were "not attributed to particular" individuals, were "not sworn," were "filled with hearsay and argument," and were "not even signed by" every plaintiff. Id. The District Court explained, however, that the plaintiffs'

responses to the interrogatories had been signed by Representative Faulkingham and by Liberty Initiative Fund's president, on behalf of Liberty Initiative Fund, as well as by the plaintiffs' counsel. Id.  The District Court then added that there is "no requirement that the interrogatory responses be signed by all the [p]laintiffs" and that the plaintiffs had "represented" in response to an earlier order of the District Court that they "w[ould] file sworn interrogatory responses, curing the oath defect 'no later than February 20, 2021.'"  Id. (record citation omitted).  The District Court then ruled, "[b]ased on the [p]laintiffs' representation," that it "consider[ed] the [p]laintiffs' responses to the [d]efendants' interrogatories as sworn."  Id.[4]

Having made those rulings, the District Court assessed whether the plaintiffs had met their burden with respect to the

---

[4] The plaintiffs filed a sworn version of their interrogatory responses on February 19, 2021.  The defendants nonetheless contend on appeal that the "sworn version of [p]laintiffs' interrogatories" "still exhibited one of the flaws identified by the Secretary, and one not addressed by the district court: they were not attributed to particular [p]laintiffs."  But, Liberty Initiative Fund, as well as Representative Faulkingham, on behalf of himself and We the People, each separately signed and attested to "knowledge, information, and belief" concerning all of the plaintiffs' responses to the interrogatories.  Moreover, Kowalski signed and attested to his knowledge concerning the plaintiffs' response to "Interrogatory #16, the only interrogatory response which requires [his] verification."  We also see no basis for crediting the defendants' conclusory assertion in their briefing to us that "[n]ot every [p]laintiff can swear to the entire contents of [p]laintiffs' wide-ranging interrogatory responses."  Thus, we consider the interrogatory responses here.

four factors that must be weighed to determine whether to grant a motion for a preliminary injunction. See id. at 37. Those factors include:

> the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.

Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020). The District Court ruled that, with the benefit of "a more substantial record including affidavits and declarations, as well as interrogatories and statements of facts," preliminary injunctive relief was appropriate. See We the People PAC, 519 F. Supp. 3d at 37, 53.

The District Court determined that the plaintiffs established that they were likely to succeed in showing that the residency and voter-registration requirements were each subject to strict scrutiny because each requirement imposed a "severe burden" on the exercise of the plaintiffs' First Amendment rights. See id. at 39, 41, 46, 50-51. The District Court further determined that the plaintiffs established that they were likely to succeed in showing that neither the residency requirement nor the voter-registration requirement could survive such scrutiny because the

defendants could not show that either requirement was narrowly tailored to serve a compelling state interest. Id. at 46-48, 51.

The District Court next determined that the plaintiffs had demonstrated that they were likely to suffer irreparable harm absent a preliminary injunction. It noted that "even if the [p]laintiffs d[id] not meet the February 16, 2021 deadline, they" would be able to "renew their signature collection efforts to put their initiative on the 2022 ballot." Id. at 52. Thus, the District Court concluded that "while an injunction might make no real difference for the current petition drive, th[e plaintiffs] will continue to suffer harm in their next petition drive." Id.

As to the effect of any injunction on the public interest, the District Court determined that while "the public has strong competing interests on both sides" of the dispute, it "has a greater interest in upholding its constitutionally protected freedom of speech" than it does in "regulati[ng] . . . referendum petitions and in protecting the integrity and grassroots nature of the direct initiative and people's veto power." Id. at 52. Finally, as to the "balance of equities," the District Court recognized that the plaintiffs had "contributed to the urgent nature of the preliminary injunction request" through "their delay" in filing their lawsuit, but ultimately found their "constitutional challenge both meritorious and important," such

that the "balance of equities weigh[ed] in the [p]laintiffs' favor." Id. at 52-53.

The District Court issued an order on February 16, 2021, that preliminarily enjoined Maine Revised Statutes title 21-A, § 903-A "to the extent it requires that petitions for a direct initiative or people's veto may only be circulated by a registered voter of Maine" and "to the extent it requires" that such petitions "may only be circulated by a resident of the state of Maine, as applied to out-of-state circulators who first submit to the jurisdiction of the state of Maine for any investigation and/or prosecution of alleged violations of Maine's election code with respect to Referendum and/or People's Veto petitions filed with" the defendants. Id. In a separate oral order, the District Court stayed the plaintiffs' motion for a permanent injunction.

The defendants filed an interlocutory appeal of the District Court's order issuing the preliminary injunction on February 22, 2021. We have jurisdiction under 28 U.S.C. § 1292(a)(1). We review a district court's decision to issue a preliminary injunction for an abuse of discretion, examining its "findings of fact for clear error and its conclusions of law de novo." Comcast of Me./N.H., Inc. v. Mills, 988 F.3d 607, 611 (1st Cir. 2021).

- 17 -

**II.**

Before diving into our analysis, it is first useful to review the only two precedents of the Supreme Court of the United States that address First Amendment challenges to a state's restriction on who may act as a "circulator" in the petition circulation process for a ballot initiative.  The two precedents are Meyer v. Grant, 486 U.S. 414 (1988), and Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999).

**A.**

In Meyer, the Court addressed a First Amendment challenge to a Colorado state law that prohibited the use of paid circulators.  486 U.S. at 417.  The Court found merit to the challenge.

In explaining why, the Court first determined that the prohibition implicated the First Amendment because it restricted "'core political speech.'"  Id. at 422.  The Court explained that the prohibition did so because "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change."  Id. at 421.  Indeed, the Court elaborated, "to capture . . . signatures, [a circulator] will at least have to persuade [potential signatories] that the matter is one deserving

- 18 -

of the public scrutiny and debate that would attend its consideration by the whole electorate." Id.

The Court then addressed the nature of the burden on core political speech that Colorado's ban on paid circulators imposed. The Court determined that the ban "restrict[ed] [the initiative proponents'] political expression in two ways." Id. at 422. First, such a prohibition "limits the number of voices who will convey [the proponents'] message and the hours they can speak and, therefore, limits the size of the audience they can reach." Id. at 422-23. Second, the prohibition "makes it less likely that [proponents] will garner the number of signatures necessary to place the matter on the ballot." Id. at 423. In consequence, the Court explained that a ban on paid circulators "has the inevitable effect of reducing the total quantum of speech on a public issue." Id.

The Court acknowledged that the plaintiffs in Meyer "remain[ed] free to employ other means to disseminate their ideas." Id. at 424. But, the Court emphasized, that fact did not meaningfully diminish the burdensome nature of the ban's restriction on core political speech, because the "prohibition of paid petition circulators restrict[ed] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." Id. "The First

Amendment," the Court explained, protects the proponents' "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."  Id.

Based on this analysis of the burden that the ban imposed on core political speech, the Court determined that the ban had to survive "exacting scrutiny" to comport with the First Amendment. Id. at 420.  The Court fleshed out the "exacting" nature of that scrutiny by observing that, because "the statute trenches upon an area in which the importance of First Amendment protections is at its zenith," the "burden that Colorado must overcome to justify this criminal law is well-nigh insurmountable."  Id. at 425 (internal quotation marks omitted).

The Court then moved on to the question of whether the ban could survive such "exacting" scrutiny.  The Court determined that the fit between the interests that Colorado had put forth in support of its ban and the means that the State had selected to further that interest was too loose for the ban to pass that "exacting scrutiny."  Id. at 425-28.

Colorado asserted two interests: first, an "interest in making sure that an initiative has sufficient grass roots support to be placed on the ballot," and second, an "interest in protecting the integrity of the initiative process."  Id. at 425.  The Court dispatched with the asserted interest in ensuring "grass roots

support" by explaining that this interest was "adequately protected by [Colorado's] requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained." Id. at 425-26. It then addressed the interest in "protecting the integrity of the initiative process." Id. at 426.

To support the contention that the ban on paid circulators was properly designed to serve the "integrity" interest, Colorado asserted "that compensation [for a circulator] might provide the circulator with a temptation to disregard" the "duty to verify the authenticity of signatures on the petition." Id. at 426. But, the Court concluded, Colorado had offered "[n]o evidence" to substantiate that contention and observed that a "professional circulator['s] . . . qualifications for similar future assignments may well depend on a reputation for competence and integrity." Id. The Court also noted that Colorado had other mechanisms in place to prevent signature fraud -- such as provisions that criminalized forging signatures on a petition and criminalized paying people to sign it -- that "seem[ed] adequate to the task of minimizing the risk of improper conduct." Id. at 426-27. Accordingly, the Court held that the ban could not survive the exacting scrutiny that applied because the ban was not

- 21 -

"necessary" to serve the state's asserted interest in preserving the integrity of the initiative process.  Id. at 426.

B.

Buckley was decided a little over a decade after Meyer. It concerned a First Amendment challenge to other restrictions that Colorado had imposed with respect to circulating a petition for the state's direct initiative process.  Buckley, 525 U.S. at 186.  Among the restrictions was a requirement that a circulator be a registered voter in the state.  Id. at 192-93.

The voter-registration requirement necessarily required a circulator to be a resident of that state.  Id. at 188 & n.3.  However, no challenge to the residency requirement had been brought.  Id.  The Court thus addressed only the portion of the voter-registration requirement that required a circulator to be not only eligible to vote in Colorado but also registered to do so.  Id. at 197.

In determining the type of First Amendment scrutiny to apply to the voter-registration requirement, the Court emphasized that "[s]tates allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."  Id. at 191.  The Court also emphasized that there is "'no litmus-paper test'" that "separate[s] valid ballot-access

provisions from invalid interactive speech restrictions." Id. at 192 (quoting Storer v. Brown, 415 U.S. 724, 730 (1974)); see also Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997).  Instead, the Court explained, there is "no substitute for the hard judgments that must be made." Buckley, 525 U.S. at 192 (quoting Storer, 415 U.S. at 730).

At the same time, the Court reaffirmed Meyer's recognition that "[p]etition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change,'" and that "First Amendment protection for such interaction . . . is 'at its zenith.'" Id. at 186-87 (quoting Meyer, 486 U.S. at 425).  Thus, the Court made a point of stating that "the First Amendment requires . . . vigilan[ce] in making those judgments" about what distinguishes a valid ballot-access restriction from an impermissible speech restriction. Id. at 192.

The Court then determined that a most demanding form of scrutiny applied to the state restriction at issue.  The Court concluded in that regard that the voter-registration requirement "produces a speech diminution of the very kind produced by the ban on paid circulators at issue in Meyer," id. at 194, which, the Court had pointed out there, was subject to a form of scrutiny that was "well-nigh insurmountable," Meyer, 486 U.S. at 425.  The Court in Buckley stated that this means of scrutinizing the

restriction at issue was "entirely in keeping with" what the Court described as "the 'now-settled approach' that state regulations 'impos[ing] "severe burdens" on speech . . . [must] be narrowly tailored to serve a compelling state interest.'" Buckley, 525 U.S. at 192 n.12 (alterations and ellipsis in original) (quoting id. at 206 (Thomas, J., concurring in the judgment)).

To support the application of that kind of scrutiny to the voter-registration requirement, the Court stated that it was "[b]eyond question" that the voter-registration requirement "drastically reduces the number of persons, both volunteer and paid, available to circulate petitions." Id. at 193. Indeed, the Court noted, the record in that case showed that the requirement rendered at least 400,000 Coloradans -- who were otherwise eligible to vote in Colorado but were not registered to do so -- unable to serve as petition circulators. Id. The Court also highlighted testimony that the "'natural support'" for a petition comes in part from "'[l]arge numbers'" of people not registered to vote. Id. at 194.

Equally notably, the Court did not at any point in assessing the degree of the burden imposed on core political speech by the voter-registration requirement attempt to quantify the number of persons that requirement excluded from the pool of otherwise available circulators who would be likely to serve as

circulators.  See id. at 194-95.  Nor did the Court attempt to assess whether permitting those excluded from the pool to serve as circulators would have increased the likelihood that the petition drive in which the plaintiffs were engaged would have secured the requisite number of signatures.  See id.  Instead, the Court highlighted the fact that the voter-registration requirement at issue "decrease[d] the pool of potential circulators as certainly as that pool [was] decreased by the prohibition of payment to circulators" without separately analyzing whether initiative proponents nonetheless could qualify their initiative for the ballot.  Id.

In that respect, Buckley followed Meyer.  There, the Court noted the fact that the record showed that if initiative proponents could pay circulators, more individuals would be "'able and willing' to circulate petitions," Meyer, 486 U.S. at 423 n.6 (record citation omitted), and focused on the proposition that proponents who are precluded from hiring circulators are forced to either "'find a large number of volunteers . . . or abandon the project,'" id. at 423 (quoting Urevich v. Woodard, 667 P.2d 760, 763 (Colo. 1983) (en banc)).  The Court did not, however, attempt to assess with any specificity the actual number of persons that would apply to circulate the petition that the plaintiffs intended to circulate.  See id. at 422-23.  Nor did the Court attempt to

assess whether any of those individuals would be either necessary to gathering the number of signatures required for a petition to be successful or more effective at gathering that number of signatures than those who had not been excluded from being circulators by the voter-registration requirement.  See id.[5]

The Court in Buckley turned next, as it had in Meyer, to the question of whether the state's restriction on who may be a circulator could survive the demanding form of scrutiny that applied.  And, the Court concluded, as in Meyer, that the restriction could not.  Buckley, 525 U.S. at 197.

The Court explained that it found wanting the fit between the challenged law and Colorado's "dominant justification" for the limitation, which "appear[ed] to be its strong interest in policing lawbreakers among petition circulators" for the sake of ensuring the integrity of the petition process.  Id. at 196.  The Court concluded that, although Colorado stressed that the applicable subpoena power of Colorado's Secretary of State "d[id] not extend beyond the State's borders," the State's "interest in reaching law

---

[5] We understand Meyer, and the part of Buckley that assessed Colorado's voter-registration requirement which we discuss here, to have been identifying the requirements there to have imposed a severe burden on core political speech only in the context of reviewing a restriction on who may be a circulator.  We thus do not understand either case to address a First Amendment challenge to any other kind of restriction that a state may impose that may make it more difficult to place a petition on the ballot. See Meyer, 486 U.S. at 421-23; Buckley, 525 U.S. at 194-96.

violators . . . [was] served by the requirement . . . that each circulator submit an affidavit setting out, among several particulars, the 'address at which he or she resides.'"   Id. (quoting Colo. Rev. Stat. § 1-40-111(2) (1998)).   The Court also explained that provisions of Colorado law that criminalized forging signatures on a petition, that voided certain sections of petitions, and that "require[d] sponsors of ballot initiatives to disclose who pays petition circulators, and how much," adequately served the state's integrity interest.   Id. at 205.   Thus, the Court held that, even "assuming that a residence requirement would be upheld," the "registration requirement [was] not warranted." Id. at 197.

Although the Court did not identify Colorado's interest in "ensur[ing] grass roots support" as its "dominant justification" for the voter-registration requirement we discuss here, id. at 196, 205, the Court did explain at the close of its opinion that Colorado had enacted other, "less problematic measures" to "meet the State's substantial interests in regulating the ballot-initiative process," including "ensur[ing] grass roots support."   Id. at 204-05.   "To ensure grass roots support," the Court explained, Colorado required that petitions be signed by a certain percentage of the state's electorate.   Id. at 205.

**III.**

We begin with an analysis of the plaintiffs' "likelihood of success on the merits," which "weighs most heavily in the preliminary injunction calculus." Ryan, 974 F.3d at 18. The defendants do not take issue with the District Court's conclusion that if a state law "'impos[es] severe burdens'" on plaintiffs' core political speech, then it "'must be narrowly tailored and advance a compelling state interest,' while '[l]esser burdens . . . trigger less exacting review.'" We the People PAC, 519 F. Supp. 3d at 39 (quoting Timmons, 520 U.S. at 358). They also recognize the need to explain why Meyer and Buckley -- despite their invalidation of the restrictions at issue in them -- do not support the District Court's ruling granting the motion for the preliminary injunction. Nonetheless, the defendants contend that Meyer and Buckley are distinguishable and that the District Court erred in concluding that the plaintiffs are likely to succeed in their challenges to the two requirements at issue. We begin our analysis by addressing the plaintiffs' challenge to the residency requirement.[6]

---

[6] We note that Meyer described the "'core political speech'" as "the expression of a desire for political change and a discussion of the merits of the proposed change" by a circulator

**A.**

As we will explain, we agree with the District Court that the plaintiffs are likely to succeed in showing that the residency requirement does impose a severe burden on core political speech, such that it may survive First Amendment review only if it is narrowly tailored to serve a compelling state interest. We then will explain why we also conclude that the District Court was right to rule that the plaintiffs have met their burden to show that they are likely to succeed in showing that the residency requirement does violate the First Amendment, insofar as the defendants must show that the residency requirement is narrowly tailored to serve a compelling state interest.

**1.**

The residency requirement bars all but Maine residents from being "circulator[s]." Me. Stat. tit. 21-A, § 903-A. The requirement thus would appear to bar the petition proponents from reaching into a pool of more than 250 million people of voting age

_____

in her efforts to "persuade potential signatories." Meyer, 486 U.S. at 421-22.  Moreover, in Buckley, the Court did not distinguish in assessing the burden on core political speech that the restriction there at issue imposed on those plaintiffs who themselves sought to circulate petitions from the burden that the restriction imposed on those plaintiffs who were proponents of the initiative itself.  See Buckley, 525 U.S. at 187 n.1, 193-95.  We follow suit and make no such distinction in assessing the burden on "core political speech" that the requirement at issue here imposes.

to assist in the collection of signatures -- and to engage in the face-to-face, interactive communication designed to bring about political change that accompanies that collection of signatures -- that the Supreme Court has deemed core political speech.  See Estimates of the Total Resident Population and Resident Population Age 18 Years and Older for the United States, States, and Puerto Rico: July 1, 2019, Population Estimates by Age (18+): July 1, 2019, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-detail.html (last visited June 24, 2022).[7]

---

[7] At oral argument, the defendants did suggest that the challenged statutes might be read to permit out-of-staters to advocate for a petition so long as there is an in-state resident who may witness the petition and certify its authenticity to the Secretary.  But, this late-breaking contention appears to be in some tension with arguments that the defendants made below.  See We the People PAC, 519 F. Supp. 3d at 43 (describing defendants' prior position in interrogatories and testimony).  We note as well that Maine law defines the "circulator" as an individual who "solicits signatures for the petition by presenting the petition to the voter" and "asking the voter to sign the petition."  Me. Stat. tit. 21-A, § 903-A; see also We the People PAC, 519 F. Supp. 3d at 29 ("The legality of using in-state witnesses is unclear.").  Finally, the defendants do not develop an argument in their briefing to us that the relevant state statute, insofar as it may be construed to permit the use of in-state witnesses along with out-of-state advocates for the petition, would not severely burden core political speech.  They instead merely state that "the same arguments apply" that they have made about why Maine law would not severely burden such speech if the statute could not be so construed.  Thus, any argument that the statute does not severely

That is not to say that Maine lacks a compelling interest in limiting that pool of potential speakers in the way that the residency requirement does.  Nor is it to say that Maine cannot show that such a limitation is narrowly tailored to serve that interest.  But, at this juncture of the analysis, our concern is solely with the threshold question of whether the requirement severely burdens core political speech, not whether the burden that requirement imposes on such speech is, though severe, justifiable because it is narrowly tailored to serve a compelling interest.  See Buckley, 525 U.S. at 192 n.12.  And, with respect to that threshold determination concerning the nature of the burden that the requirement imposes, it is "[b]eyond question" that the residency requirement imposes a restriction on the available pool of circulators that is at least as "drastic[]" as the restrictions at issue in either Meyer or Buckley.  Buckley, 525 U.S. at 193 (considering the burden of eliminating from the pool of potential circulators "[a]t least 400,000 persons eligible to vote" who "were not registered"); see also Meyer, 486 U.S. at 422-23 & n.6 (describing testimony that "compensation resulted in more people

---

burden core political speech because it may be construed to permit the use of in-state witnesses along with out-of-state advocates for the petition is waived for the purposes of this appeal.  See United States v. Kinsella, 622 F.3d 75, 87 (1st Cir. 2010).

being 'able and willing' to circulate petitions" (record citation omitted)).

The defendants are right, of course, that Buckley was "careful . . . to differentiate between registration requirements, which were before the Court, and residency requirements, which were not," Lux v. Rodrigues, 561 U.S. 1306, 1308 (2010) (Roberts, C.J., in chambers). And it is the latter type of requirement that is at issue here. But, it remains the case that Maine's ban on the use of out-of-state circulators "drastically reduces the number of persons, both volunteer and paid, available to circulate petitions" and "decreases the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators" just as the Court in Buckley found that the voter-registration requirement there at issue did. Buckley, 525 U.S. at 193-94.

Buckley did arguably also address whether the reduction in the pool of potential circulators, even though drastic, was in effect a material one. 525 U.S. at 193-94. Buckley highlighted testimony in the record that indicated that the pool of otherwise eligible voters who were not registered was a pool from which there was reason to think circulators would be drawn, because that testimony identified such unregistered voters as providing

"natural support" for petition drives.  Id. at 194 (record citation omitted).

But, there is evidence of that sort here as well.  The District Court found that there were a significant number of "professional petition circulators" residing outside of Maine and that the plaintiffs had identified only six professional circulators who were Maine residents.  We the People PAC, 519 F. Supp. 3d at 42.  The District Court further found that, as common sense would suggest, professional circulators would enhance the capacity of proponents of a petition drive to secure signatures. See id. at 43.  Indeed, record evidence concerning the plaintiffs' experience with the petition drive that they did conduct supported that conclusion.  See id. at 42-44.

The defendants do contend that the District Court should not have credited the plaintiffs' assertion that only six professional circulators could be identified in Maine, see We the People PAC, 519 F. Supp. 3d at 42, on the ground that the plaintiffs "offered few specifics as to how they settled on this figure" beyond "inadmissible hearsay."  But, the District Court considered that argument, along with the defendants' evidence that the number could be much higher.  See id. at 28 nn.16-17.  And, the District Court credited the plaintiffs' "assertion that they could only identify six professional petition circulators in

Maine," while excluding as hearsay only some evidence supporting that conclusion.  Id. at 28 n.17.

The District Court did not clearly err in making this finding.  The record includes the declaration of the plaintiffs' initiative campaign manager, who attested to having "personal knowledge" concerning the attitudes of what he described as "the few professional petition circulators who are residents" of Maine.

The defendants also contend that "there are likely thousands" of Maine residents who may not "make a living circulating petitions" as professional circulators but would be willing to circulate petitions "for pay."  They then further contend that, for this reason, the District Court erred in ruling that the residency requirement likely imposes a severe burden on core political speech.

The relevant question, though, is not how many Maine residents might be willing to circulate a petition if paid to do so.  The relevant question is whether the residency requirement excludes from the pool of potential circulators a sufficiently significant number of individuals -- including professional circulators that could enhance the reach of the campaign -- who may reside outside of Maine.

The defendants do also argue that the plaintiffs are not likely to succeed in showing that the requirement imposes a severe

burden on core political speech because "the record is replete with evidence of successful citizen initiative and people's veto campaigns in Maine." For example, they point to the fact that "one recent campaign collected approximately 100,000 signatures using 616 Maine circulators during the same three-month period that [the p]laintiffs' campaign was active."

We are not persuaded by this argument. We have no reason to doubt that, despite the residency requirement, petition drives may employ Maine residents as circulators and may even succeed by doing so. But, Meyer and Buckley each rejected a contention that the existence of an alternative means of securing the requisite number of signatures for a petition in and of itself "lift[s] the burden on speech at petition circulation time." Buckley, 525 U.S. at 195; see also Meyer, 486 U.S. at 424. Indeed, the Court concluded in Meyer that the "burden on First Amendment expression" was not mitigated "because other avenues of expression remain[ed] open" to the proponents; it explained that the Constitution protects the right "not only to advocate the[] cause but also to select what [the proponent] believe[s] to be the most effective means for so doing." 486 U.S. at 424; see also We the People PAC, 519 F. Supp. at 42-43.

Nor are we persuaded by the defendants' argument that the District Court erred in concluding that the requirement likely

imposed a severe burden on political speech by relying on the mistaken (or, at least, unsupported) premise that out-of-state circulators -- and especially out-of-state <u>professional</u> circulators -- are more effective than in-state circulators when the plaintiffs had made no showing to substantiate it. The District Court did not point to the burden that the residency requirement placed on the use of "out-of-state professional petition circulators" to make the point that out-of-state residents would, as a general matter, make for better circulators than in-state circulators. The District Court pointed to that burden instead to make the separate point that Maine's residency requirement drained from the "pool" of potential circulators those who were professionals in the work of circulating petitions -- and may therefore be more efficient than non-professional circulators -- and who also resided outside Maine. <u>We the People PAC</u>, 519 F. Supp. 3d at 42-43.

The defendants next assert that the District Court erred in concluding that strict scrutiny likely applied because "[t]here is also no record evidence that Maine's residency requirement unconstitutionally increased the cost" of the plaintiffs' petition drive. But, even assuming that the defendants are right that out-of-state circulators cost "a premium," the fact that the plaintiffs may be willing to pay such a premium only highlights the severity

of Maine's "limit[ation]" on "the number of voices who will convey [the plaintiffs'] message and the hours that they can speak and, therefore, . . . [on] the size of the audience they can reach," Meyer, 486 U.S. at 422-23.

Finally, we observe, as the District Court did, that the conclusion that the plaintiffs are likely to succeed in showing that the residency requirement must be subjected to strict scrutiny draws substantial support from lower court precedent. We the People PAC, 519 F. Supp. 3d at 40-41. See Yes On Term Limits, Inc. v. Savage, 550 F.3d 1023, 1025, 1028 (10th Cir. 2008) (applying "strict scrutiny" to a "ban on non-resident [initiative] petition circulators"); Libertarian Party of Va. v. Judd, 718 F.3d 308, 311-12, 317 (4th Cir. 2013) (holding that "[s]trict scrutiny is the proper standard" to apply to state-residency requirement to circulate candidate-nominating petitions); Nader v. Brewer (Brewer), 531 F.3d 1028, 1031-32, 1036 (9th Cir. 2008) (same); Wilmoth v. Sec'y of N.J., 731 F. App'x 97, 99, 103 (3d Cir. 2018) (same, as applied to circulator-plaintiffs); see also Nader v. Blackwell (Blackwell), 545 F.3d 459, 462 (6th Cir. 2008); id. at 478-79 (Moore, J., and Clay, J., each separately concurring in part and in the judgment) ("hold[ing] that the residency restriction" on circulators of candidate-nominating petitions "severely limits political speech" of the plaintiff-candidate);

cf. Krislov v. Rednour, 226 F.3d 851, 855, 862 (7th Cir. 2000) (applying "exacting scrutiny" to a voter-registration requirement for circulators of candidate-nominating petitions that also imposed a state-residency requirement).

The defendants are right that all but one of these precedents addressed residency requirements for circulators of candidate-nominating petitions. See Libertarian Party of Va., 718 F.3d at 311-12; Brewer, 531 F.3d at 1031; Blackwell, 545 F.3d at 462; Wilmoth, 731 F. App'x at 99; Krislov, 226 F.3d at 856. But, the defendants do not explain why that feature of those cases renders those precedents off point in evaluating a functionally analogous restriction on who may circulate a petition for a direct initiative. Indeed, all but one of the candidate-nominating precedents apply or rely on cases that apply the Meyer-Buckley framework to analyze the level of scrutiny that applies. See Libertarian Party of Va., 718 F.3d at 316-17; Brewer, 531 F.3d at 1035-36; Wilmoth, 731 F. App'x at 102-03; Krislov, 226 F.3d at 859-62. The one precedent that arguably may be read to not so hold, moreover, provides no basis for concluding that the Meyer-Buckley framework is inapplicable or leads to a different result here simply because a candidate-nominating petition is not involved. See Blackwell, 545 F.3d at 459, 474-75 (lead opinion of

Boggs, C.J.); id. at 478 (Moore, J., and Clay, J., each separately concurring in part and in the judgment).

The defendants do cite to Initiative & Referendum Institute v. Jaeger, an Eighth Circuit decision that upheld a state-residency requirement for circulators of initiative petitions.  241 F.3d 614, 615 (8th Cir. 2001).  That case does state that certain evidence in the record there "demonstrates that no severe burden has been placed on those wishing to circulate petitions."  Id. at 617.  But, even if the Eighth Circuit may be read to hold that the residency requirement was not subject to strict scrutiny because it imposed no severe burden on core political speech, see id. at 616 (explaining that "the State ha[d] a compelling interest in preventing fraud and the regulation [did] not unduly restrict speech" and thus "conclud[ing] that the residency requirement [was] constitutional."); Wilmoth, 731 F. App'x at 102 (describing Jaeger as having "appl[ied] strict scrutiny review"), it invoked the "high success rate" of signature campaigns as "demonstrat[ing] that no severe burden has been placed on those wishing to circulate petitions." Jaeger, 241 F.3d at 617.  Such reasoning conflicts, however, with Meyer, which applied exacting scrutiny after pointing to "the possibility that even more petitions would have been successful if paid circulators had been available." Meyer, 486 U.S. at 418 n.3, 420.

The defendants independently rely on an unpublished decision from the federal District Court for the District of Maine, see Initiative & Referendum Inst. v. Sec'y of State of Me., No. Civ. 98-104, 1999 WL 33117172 (D. Me. Apr. 23, 1999), which the Eighth Circuit cited approvingly, see Jaeger, 241 F.3d at 617-18. The district court declined in that case to apply strict scrutiny to Maine's state-residency requirement for circulators. See Initiative & Referendum Inst., 1999 WL 33117172, at *16. But, the district court there did not assess whether the residency requirement would drastically reduce the available pool of circulators, which is the relevant question here. Id. at *16 & n.18.

The defendants are right that there are other circuit court decisions that have not applied strict scrutiny to restrictions that pertain to petition circulators. See Libertarian Party of Ohio v. Husted, 751 F.3d 403, 413-18 (6th Cir. 2014) (declining to apply strict scrutiny to state law requiring "circulators of candidacy or nomination petitions to disclose the name and address of" their employer); Prete v. Bradbury, 438 F.3d 949, 963, 968 (9th Cir. 2006) (restriction on specific payment scheme for circulators imposes only "lesser burden" on speech). But, the nature of the restrictions in those cases differs from that of the residency requirement at issue here.

Finally, the defendants highlight the fact that Maine's highest court declined to apply strict scrutiny to the provisions of the Maine Constitution that require circulators of direct initiatives to be state residents. See Hart, 715 A.2d at 168. But, significantly, Hart, which was decided before Buckley, distinguished Meyer on the ground that the plaintiff in Hart "had three years to gather the necessary signatures and failed to demonstrate any necessity for employing nonresidents in circulating the petitions." Id. (citation omitted). Yet, as we have explained, it is clear after Meyer and Buckley that the determination of whether a restriction on who may be a circulator imposes a severe burden on core political speech is not dependent on whether it is necessary for the ballot measure's proponents to be able to enlist those who are subject to the restriction to obtain the requisite number of signatures. See Meyer, 486 U.S. at 418 n.3; Buckley, 525 U.S. at 195.

Thus, the record supports the conclusion that the sheer "reduc[tion in] the number of persons . . . available to circulate petitions" as a result of the residency requirement at issue here is at least as "drastic[]" as it was as a result of the registration requirement that the Court addressed in Buckley, 525 U.S. at 193 & n.15 (considering the exclusion of less than one million people "eligible" but not "registered" to vote). Similarly, the record

supports the conclusion that the residency requirement imposes a material limitation on the proponents' ability "to select what they believe to be the most effective means" to "advocate their cause" as in Meyer, 486 U.S. at 424.  Accordingly, we are not persuaded by the defendants' arguments that the District Court erred in concluding that the plaintiffs are likely to succeed in showing that strict scrutiny applies to the requirement because it imposes a severe burden on core political speech.

**2.**

We move on, then, to the next stage of the inquiry, which concerns whether the residency requirement serves a compelling state interest in a narrowly tailored manner.  The defendants assert two compelling interests: "ensuring that circulators can be located easily and efficiently" to combat petition fraud, and "protecting the very means by which Mainers exercise their right to legislate," by ensuring "that a power held by Mainers is administered -- and policed -- by Mainers."  We consider each interest in turn, as well as the extent to which the residency requirement is narrowly tailored to serve each one.  We conclude, as we will explain, that the District Court did not err in holding that the plaintiffs are likely to succeed in their First Amendment challenge to the residency requirement, notwithstanding the

defendants' arguments about why that requirement survives even strict scrutiny.

**a.**

The District Court did not question the first of the defendants' asserted compelling interests, which the District Court described as Maine's "strong interest in protecting its elections." We the People PAC, 519 F. Supp. 3d at 46. The District Court concluded instead that, even if Maine's interest in "monitor[ing] and prosecut[ing] petition fraud" is compelling, the plaintiffs are likely to succeed in demonstrating that the defendants cannot show that the residency requirement is narrowly tailored to serve that interest. Id. We agree.

As we have seen, Meyer rejected the argument that Colorado's ban on paid circulators was narrowly tailored to serve a like interest. 486 U.S. at 426-27. Meyer pointed as support for that conclusion to "[o]ther provisions" of Colorado law that expressly imposed penalties for petition fraud as "adequate to the task of minimizing the risk of improper conduct in the circulation of a petition, especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." Id. Those provisions made it "a crime to forge a signature on a petition, to

make false or misleading statements relating to a petition, or to pay someone to sign a petition." Id. at 427 (citations omitted).

Buckley is no different. It rejected an argument that Colorado's voter-registration requirement was narrowly tailored to serve the state's interest in preserving election integrity, explaining that Colorado's "interest in reaching law violators" was served by a requirement "that each circulator submit an affidavit setting out, among several particulars, the 'address at which he or she resides.'" 525 U.S. at 196 (quoting Colo. Rev. Stat. § 1-40-111(2) (1998)).

Nothing indicates that there is a better fit here between the interest in election integrity that Maine asserts and the restriction on who can be a circulator that Maine has imposed through its residency requirement, at least "as [that requirement is] applied to out-of-state circulators who first submit to the jurisdiction of the state of Maine" for alleged violations of Maine law. We the People PAC, 519 F. Supp. 3d at 53; cf. Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2457, 2461-62, 2475 (2019) (holding that state's residency requirement for the issuance of a license to operate a liquor store could not survive Twenty-First Amendment scrutiny, despite the state's contention that the requirement ensured amenability to process in state courts and state regulatory oversight, because

"alternatives" such as "requiring a nonresident to . . . consent to suit" and "on-site inspections" remained available). Nor are we persuaded by the defendants' arguments to the contrary.

The defendants contend that Maine's interest in the integrity of its elections "is not limited to the ability to force circulators to return to the state," because that interest also extends to "being able to quickly and efficiently <u>contact</u> circulators to, for example, investigate potential signature fraud." For that reason, the defendants contend, even though Maine could subpoena out-of-state circulators, that option "is hardly a realistic" one for the Secretary to exercise during the thirty-day petition review period.

But, Maine law already requires circulators to disclose in an affidavit "the physical address" at which they reside. Me. Stat. tit. 21-A, ch. 11, § 903-A(4)(A). Furthermore, a requirement that circulators provide up-to-date contact information and submit to legal process is, like the requirement that circulators provide an "address attestation" identified in <u>Buckley</u>, an alternative that "has an immediacy, and corresponding reliability" that a mere requirement that the circulator be a Maine resident "lack[s]," 525 U.S. at 196.

The defendants also do not explain why -- in this day and age -- resident circulators are so much easier to contact than

nonresident circulators that a flat-out ban on out-of-staters is necessary.  Nor have the defendants explained why Maine could not further its interest on this score just as effectively by requiring out-of-state circulators to provide up-to-date contact information.  See Buckley, 525 U.S. at 196.

A substantial body of out-of-circuit precedent accords with this analysis, as the District Court pointed out.  See We the People PAC, 519 F. Supp. 3d at 46-47; see also Brewer, 531 F.3d at 1037 ("Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction . . . and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result."); Yes on Term Limits, Inc., 550 F.3d at 1029-30; Libertarian Party of Va., 718 F.3d at 318.  Such contrary precedent as there is, moreover, does not lead us to conclude that the District Court's application of the narrow tailoring requirement was mistaken.

The defendants are right that the Eighth Circuit held in Jaeger that North Dakota's residency requirement for petition circulators was constitutional because the state "ha[d] a compelling interest in preventing fraud," and that the requirement "allow[ed]" the state "to protect the petition process from fraud and abuse by ensuring that circulators answer to [its] subpoena

- 46 -

power."  241 F.3d at 616.  But, the plaintiffs in that case did
not propose, and the Eighth Circuit did not consider, the narrower
means of achieving that interest that we find available here:
requiring out-of-state circulators to provide up-to-date contact
information and to submit to legal process in the state.  See id.;
Brief of Appellants at 38-42, Initiative & Referendum Institute v.
Jaeger, 241 F.3d 614 (8th Cir. 2001) (No. 99-3434).

        The defendants also rely for their position on the Maine
Law Court's opinion in Hart, which they describe as having found
that the residency requirement "serves the Secretary's important
interest in making 'circulators easier to locate if there is a
question as to the validity of the signatures collected'" (quoting
Hart, 715 A.2d at 168).  But, the plaintiffs in that case did not
argue in their brief to that court that Maine could instead require
circulators to submit to legal process or provide their contact
information to the state.  See Hart, 715 A.2d at 168; Brief of
Appellants, Hart v. Sec'y of State, 715 A.2d 165 (Me. 1998), 1998
WL 35076164, at *16-18; see also Brief of Appellee, Hart v. Sec.
of State, 715 A.2d 168 (Me. 1998), 1998 WL 34501218, at *9-20.
Indeed, aside from the single sentence in its opinion in which the
Maine Law Court stated that the residency requirement "provide[d]
the State with jurisdiction over the circulators and ma[de] the
circulators easier to locate," the Law Court did not further

- 47 -

explain its basis for concluding that interest was one that Maine's residency requirement was narrowly tailored to serve.  See Hart, 715 A.2d at 168.

The defendants also point to the role that circulators play in what the Maine Law Court described in Hart as "preserving the integrity of the law-making process." Hart, 715 A.2d at 168. In Meyer, however, the Court was "not prepared to assume" that a paid circulator was "any more likely to accept false signatures" than a circulator who was "motivated entirely by an interest in having the proposition placed on the ballot." 486 U.S. at 426. We see no reason here to make the assumption that Meyer declined to make simply because a paid circulator is not a Maine resident.

We thus reject the contention that the District Court erred in ruling that the plaintiffs were likely to succeed in showing that the residency requirement is not narrowly tailored to serve the state's interest in protecting the integrity of its elections.  And that is so even if we account for Maine's asserted interest in efficiently locating circulators.

**b.**

The defendants separately argue that Maine has a compelling interest "in limiting participation in its political process to its residents" (quoting Initiative & Referendum Inst., 1999 WL 33117172 at *15).  Here, the District Court rejected what

it described as the defendants' "grassroots interest" argument. See We the People PAC, 519 F. Supp. 3d at 47-48. It did so on the ground that, as in Meyer, 486 U.S. at 425-26, and Buckley, 525 U.S. at 205, Maine already requires that successful initiative petitions consist of a minimum number of signatures, and that it further requires that the petition "be signed by Maine citizens and approved by Maine voters on election day before becoming law." We the People PAC, 519 F. Supp. 3d at 47-48. We agree.

The defendants argue otherwise based in part on Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 68-69 (1978). There, the Court explained that its precedents "have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." Id. at 68-69. But, Holt concerned participation in the political process through voting rather than through the circulation of a petition. Id. at 61-63, 66-69. Thus, the fact that Holt upheld a limitation on the voting rights of non-residents does not show that a limitation on the right of non-residents to circulate a petition is constitutional, as Buckley itself makes clear. See Buckley, 525 U.S. at 196 n.17.

The defendants also rely on the unpublished opinion in Initiative & Referendum Institute v. Secretary of State, in which the District Court for the District of Maine stated that "Maine's

interest in limiting participation in its political process to its residents is compelling" and that Maine could permissibly require petition circulators to be Maine residents due to the "vital role" that circulators play "in the process of self-government."  1999 WL 33117172 at *15 (citing Holt, 439 U.S. at 68-69).  Although the defendants do not expand on this "self-government" argument, they do advance the related contention that "[t]he initiative power is a legislative right reserved in Maine's Constitution for Maine's residents, and the exercise of that power is not limited to signing a petition or voting for an initiative, but rather includes the circulation of petitions."

But, in Meyer the Court rejected the argument "that because the power of the initiative is a state-created right, [Colorado] is free to impose limitations on the exercise of that right."  486 U.S. at 424.  The Court explained that "the power to ban initiatives entirely" does not "include[] the power to limit discussion of political issues raised in initiative petitions." Id. at 425.  Nor, as we have already explained, is this a case in which either the state measures imposing the restrictions or the defendants' interpretation of them provides any legal clarity as to whether out-of-state circulators are permitted to engage in petition circulation when accompanied by an in-state "witness," see We the People PAC, 519 F. Supp. 3d at 29-30, such that it is

evident that the residency requirement does not severely burden "core political speech," id. at 53.

The defendants relatedly contend that the residency requirement is narrowly tailored to serve their interest in "limiting the responsibility of circulation" to "those who possess the right to advance and pass citizen legislation and must live under any resulting law." They cite for this proposition to the Maine Law Court's decision in Hart, which found that Maine's residency requirement "enhances the integrity of the initiative process by ensuring that citizens initiatives are brought by citizens of Maine." 715 A.2d at 168.

But, in light of Meyer and Buckley, we fail to see why banning non-resident circulators is narrowly tailored to serve that interest. After all, only the individuals who must live under any resulting law may sign the petition, see Me. Const. art. IV, pt. 3, § 20, and only Maine voters may vote to approve any measure that does reach the ballot by way of a successful petition. See We the People PAC, 519 F. Supp. 3d at 47. In addition, as the District Court noted, the defendants have not argued that Mainers are "especially vulnerable to blandishments from out-of-state circulators." Id. at 48.

**3.**

Thus, on the record before us, the residency requirement likely "inhibit[s] communication with voters about proposed political change" and is likely "not warranted by the state interests . . . alleged to justify [it]."  <u>Buckley</u>, 525 U.S. at 192.  We therefore agree with the District Court that the plaintiffs have established that they are likely to succeed in proving that the residency requirement violates the First Amendment.

**B.**

We turn now to Maine's voter-registration requirement for the circulation of petitions.  We first conclude that the District Court did not err in ruling that this requirement also likely is subject to strict scrutiny.  We then further conclude that, given the interests that Maine has asserted, the plaintiffs have met their burden to show that the requirement is not likely to survive that level of scrutiny.

**1.**

With respect to the burden that the voter-registration requirement imposes, it is problematic -- as the plaintiffs suggest -- to consider only the portion of that requirement that concerns the act of registering in the abstract.  The requirement is not to be a registered voter somewhere.  It is a requirement to be

registered to vote in Maine, Me. Stat. tit. 21-A, § 903-A, which
is possible only if one is otherwise eligible to vote in Maine,
see Me. Const. art. II, § 1, and which means that the requirement
necessarily excludes those not meeting the residency requirement.

In challenging the District Court's ruling as to the
registration requirement, the defendants begin by contending that
"if the residency requirement does not impose a severe burden,
then the registration requirement does not do so, either." But,
they develop no argument in favor of the converse -- namely, that
if the residency requirement does likely impose a severe burden,
the registration requirement does not. Instead, they merely argue
that the additional burden imposed by the registration requirement
beyond the residency requirement is minimal, such that it does not
result in the imposition of a severe burden on core political
speech insofar as the residency requirement itself does not.

To that point, the defendants contend that
"[r]egistering to vote in Maine is both easy and straightforward."
They also assert that only three percent of eligible Maine
residents are not registered to vote, which, by their own account,
excludes at least the 32,000 Maine residents who are eligible but

not registered to vote from serving as circulators.[8]  And, in support of that contention, the defendants point to two cases that have upheld Maine's voter-registration requirement after concluding that it did not impose a severe burden on core political speech given the relatively small number of Mainers who were excluded from serving as circulators. See Initiative & Referendum Inst., 1999 WL 33117172, at *15; Jones, 238 A.3d at 992 ("[T]he individual circulators whose petitions are in dispute here were not opposed to registering to vote and indeed became registered voters in their municipalities, albeit after they circulated the disputed petitions.").

But, even if we were to assume that a restriction that would exclude tens of thousands of possible circulators would not for that reason alone severely burden core political speech, see Buckley, 525 U.S. at 193, 194-95 (describing burden imposed by voter-registration requirement that excluded 400,000 Coloradan residents from serving as circulators (citing Meyer, 486 U.S. at 422)), the residency requirement, as we have explained, does

---

[8] As the District Court observed, that number may even be higher, as Maine's Constitution requires not merely that prospective circulators be registered to vote in Maine but also that they be registered to vote in the specific "city, town or plantation" in which they reside.  Me. Const., art. IV, pt. 3, § 20; We the People PAC, 519 F. Supp. 3d at 32, 50, 51. Although the defendants contend that the District Court did not rely on any evidence for the proposition that the number therefore "must be" higher, id. at 51, the inference that it would be is reasonable.

likely impose a severe burden on core political speech.  Thus, in light of that ruling, we have no basis here, given the defendants' own contentions, to conclude that the voter-registration requirement does not likely do so as well.

**2.**

The defendants appear to acknowledge that, if the residency requirement cannot survive strict scrutiny, then neither can the voter-registration requirement insofar as it "serves the residency requirement."  Nonetheless, the defendants contend that the registration requirement can survive such scrutiny even if the residency requirement cannot, because it is a standalone means of "serv[ing] the same integrity interest that residency does."

The defendants assert in support of that contention that the registration requirement serves this integrity interest by "limit[ing] participation" in the initiative process "to those who are invested enough to take the trouble to register to vote" (quoting Initiative & Referendum Inst., 1999 WL 33117172, at *15).  The requirement does so, they further assert, because it "ensures that each circulator has a vested interest in the initiative they hope to pass, in that each will be able to vote on that initiative should it qualify for the ballot."

The defendants cite as support for this contention to Initiative & Referendum Institute v. Secretary of State, 1999 WL

33117172, at *15.   But, the court there did not apply strict scrutiny to the voter-registration requirement.  Id.  It thus did not assess whether that restriction was narrowly tailored to serve the state's purported interest in limiting participation in the initiative process.  Id.  Moreover, we see no basis in the record for assuming that circulators who are not registered to vote in Maine will be less likely to abide by an oath to verify the validity of the signatures that they witness, or otherwise to go about the petitioning business in accordance with Maine's laws, than those who are not.  Cf. Meyer, 486 U.S. at 426 ("[W]e are not prepared to assume that a professional circulator . . . is any more likely to accept false signatures than a volunteer . . . ."); Buckley, 525 U.S. at 203-04.

So, for these reasons, we agree with the District Court that it is likely that the voter-registration requirement does not appropriately fit the asserted integrity interest.  And, to the extent that the integrity interest the defendants advance here is just a way of restating the interest in limiting the "initiative power" to "Maine's residents" that they advance in defense of the residency requirement, it is problematic for the same reason that such a contention is in that context.

In the absence of a compelling state interest to which the voter-registration requirement is narrowly tailored, we cannot

conclude that it survives strict scrutiny.  See Buckley, 525 U.S. at 192 n.12.  Thus, as is the case with the residency requirement, we conclude that the District Court did not err in holding that the plaintiffs are likely to succeed on the merits of their First Amendment challenge to the voter-registration requirement.  And, we note that this decision is in accord with decisions of our sister circuits, as none in the wake of Buckley has upheld such a restriction after applying strict scrutiny.  See Blackwell, 545 F.3d at 478 (Moore, J., concurring in part and in the judgment) ("We hold that the voter-registration requirement . . . is a severe restriction on political speech which cannot survive strict scrutiny."); Krislov, 226 F.3d at 856, 866 (striking requirement that circulators "be registered to vote in the same political subdivision for which the candidate is seeking office" as not meeting "exacting scrutiny").

**IV.**

There remains to address the other factors in the preliminary injunction analysis -- first, the potential for "irreparable harm," second, "the balance of relative hardships," and third, the question whether an injunction would be in the "public interest."  See Ryan, 974 F.3d at 18.  We begin with the last two factors, as the analysis of them is straightforward.  We continue to review for abuse of discretion, mindful that "[a]part

from error of law, an abuse of discretion occurs when the district court considers improper criteria, ignores criteria that deserve significant weight, or gauges only the appropriate criteria but makes a clear error of judgment in assaying them." Rosario-Urdaz v. Riviera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003).

## A.

In arguing that the District Court erred in determining that the "balance of relative hardships" and "public interest" factors favored granting the preliminary injunction, Ryan, 974 F.3d at 18, the defendants contend that the plaintiffs unduly delayed in filing their lawsuit and that the District Court should not have permitted them "to manufacture a need for extraordinary relief through their own lack of diligence." See Respect Maine PAC, 622 F.3d at 16 (concluding "this 'emergency' is largely one of [plaintiffs'] own making" where, "well aware of the requirements of the election laws," they "chose" not to sue until approximately three months prior to an election date). The defendants further contend that "this case concerns a core right held by all Maine residents" and that the preliminary injunction therefore harms the "public -- namely, Mainers" and their "interest in protecting the integrity of a legislative power reserved to them under their state constitution."

But, the District Court did not abuse its discretion in ruling that, even though the plaintiffs' delay in filing their lawsuit "put the Court in the undesirable position of considering an important constitutional challenge on an expedited basis," the "constitutional challenge" before it was "both meritorious and important." We the People PAC, 519 F. Supp. 3d at 52. Moreover, the District Court recognized the public's "strong competing interests" in "the regulation of referendum petitions and in protecting the integrity and grassroots nature of the direct initiative and people's veto power" on the one hand, and in "ensuring the freedom of speech and constitutionality of election laws" on the other. Id. It then reasonably concluded that "the public has a greater interest in upholding its constitutionally protected freedom of speech." Id.

**B.**

That leaves only the defendants' arguments with respect to "the potential for irreparable harm in the absence of an injunction." González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009). With respect to the plaintiffs' then-ongoing campaign for which they had not gathered sufficient signatures, the District Court concluded that the plaintiffs had "shown a severe burden and [we]re not required to further prove that it is impossible to gather enough signatures under the current law." We

the People PAC, 519 F. Supp. 3d at 52; see also id. at 51 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976))).  The defendants appear to agree with that description of what the plaintiffs must show to satisfy the irreparable harm requirement.

The District Court determined that the plaintiffs' showing with respect to the likelihood of this "continuing deprivation" of their First Amendment rights also shows that they are likely to suffer "an irreparable harm."  See id.  The District Court acknowledged in so ruling that it was issuing the preliminary injunction on the day on which the plaintiffs' petition had to be submitted to municipal officials for certification of signatures so that it could be filed with the Secretary's office for placement of that initiative on the November 2022 ballot.  See id. at 44, 52.  But, the District Court held that "while an injunction might make no real difference for the [then-]current petition drive," the plaintiffs would "continue to suffer harm in their next petition drive," and identified a "continuing deprivation" that "acts as an irreparable harm" on that basis as well.  Id. at 52. The District Court then preliminarily enjoined the requirements as to future drives.  Id. at 53.

The defendants argue to us that the District Court abused its discretion in this regard by relying on "a hypothetical future campaign" to conclude that the plaintiffs were at risk of irreparable injury.  They contend that the "contingency plan" to initiate a new petition drive "cannot, as a matter of law . . . establish a likelihood of irreparable harm" because it is too uncertain.  See In re Rare Coin Galleries, Inc., 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction.").

But, when asked in an interrogatory about the implications of the timing of their lawsuit, the plaintiffs explained that even if they did not make the February 2021 deadline, they would be able to "immediately refile the initiative petition and still make the 2022 ballot if they file[d] signatures from a new petition drive with signatures collected from March 2021 to January 2022."  And while the defendants contend that this statement did not constitute a "commitment to a new campaign" and to apply for a new initiative petition form, but merely indicated the plaintiffs' awareness of the relevant deadlines should they choose to "'refile,'" the statement in context is fairly construed as a representation that the plaintiffs' reasons for seeking a

preliminary injunction would persist past the then-impending February 16, 2021 deadline.[9]

We also are not persuaded by the defendants' challenge to the finding of irreparable harm on the ground that, even if the record does show that the plaintiffs intended to file future petitions, "[t]he record does not touch upon preparations for any future campaign, or predictions for how a new campaign, which could be conducted during the summer of 2021 and in an improving pandemic environment, would unfold." As we have explained in addressing the "likelihood of success" prong of the analysis, the burden on core political speech that the residency- and voter-registration requirements each imposes arises from the drastic limitation on the pool of out-of-state circulators that each inherently imposes.[10]

_____

[9] The record also contains the signed declaration of the President of plaintiff Liberty Initiative Fund stating that Liberty Initiative Fund "seeks relief from these restrictions not only so that [it] can reach enough people to place the Citizen Voting initiative on the 2022 ballot, but so that [it] can, working with We the People PAC and other Mainers, place other reform measures . . . on the ballot in 2022 and 2024." The defendants do not appear to have disputed this statement below, nor do they do so on appeal.

[10] The defendants separately contend that if the plaintiffs truly "had premised their request for a preliminary injunction on long-term harm to a future campaign," then "the

**V.**

The order issuing the preliminary injunction is
**Affirmed**.

---

Secretary would . . . have insisted on the development of a full
preliminary injunction record and traditional sequential
briefing." But, the defendants do not identify any arguments that
they were unable to make or evidence that they were unable to
collect as a result of the District Court's docket management
practices. We also note that the defendants have not advanced any
separate argument that, even if there has been a showing of
irreparable harm with respect to the filing of future initiative
petitions, that showing cannot support a preliminary injunction
with respect to the petitioning process for any post-2022 ballot
measures or with respect to the restrictions on circulators of
petitions for a people's veto. The parties are free on remand to
address any issue in that regard.